UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 08-23523-CIV-SEITZ/O'SULLIVAN

THE MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA, a federally-recognized
Indian Tribe,

        Plaintiff,

v.

UNITED STATES OF AMERICA,
U.S. DEPARTMENT OF INTERIOR,
NATIONAL PARK SERVICE, DIRK
KEMPTHORNE, Secretary, U.S. Department
of Interior, in his official capacity, and
FRAN P. MAINELLA, Director, National
Park Service, in her official capacity,

        Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING MOTION TO STRIKE

THIS dispute arises from the National Park Service's ("NPS") decision to reconstruct a scenic road abutting the homes of Plaintiff's tribe members.[1] At the September 18, 2009 hearing on Defendants' ("the Government") Motion to Dismiss [DE 18], the Government argued that Plaintiff lacked standing to sue under Public Law 109-148 (Count I) and 31 U.S.C. § 1301 (Count II) because those appropriations statutes accorded it no legally protected interest. Defendants reiterated, however, that they did not move to dismiss Plaintiff's National Environmental Policy Act action (Count III). Plaintiff (the "Tribe") insists that the Government's standing inquiry is too stringent. Instead, the Tribe maintains that it has standing to sue under the appropriations statutes because: (1) the NPS's project ("Project") does not comply with the statutes' intended purpose; and (2) the Project will harm its resident members.

The Government also moves to strike [DE 35] the Tribe's affidavits revealing statements made at the parties' settlement conference on April 27, 2009 pursuant to Fed. R. Evid. 408. In response, the Tribe argues that it offered the affidavits to demonstrate that the Government's stated purpose for the Project was made in bad faith,

---

[1] On September 21, 2009, the NPS notified the Court that it expects to begin construction on November 16, 2009. (*See* DE 39.) On September 24, 2009, NPS stated that they would agree to stay construction until December 1, 2009 to allow the Tribe to seek interim injunctive relief. (*See* DE 41.)

and the Court should permit discovery into the Government's ulterior motives. After reviewing the motions, the responses and reply thereto, the complaint, and the relevant law, the Court will grant the Government's motion to dismiss because the Tribe has not demonstrated an interest in the appropriations statutes which this Court has jurisdiction to enforce. The Court will deny the Government's motion to strike because statements from settlement discussions can be admitted to show a parties' bad faith. Nevertheless, given that: (1) only Count III remains in this action; and (2) the administrative record has not yet been filed, the Tribe fails to demonstrate a basis to warrant discovery beyond the administrative record.

I.      **Background**

Loop Road is a 26-mile roadway across Big Cypress National Preserve,[2] a federally designated national park, in the Florida Everglades. (*See* DE 16 "Amended Complaint" ¶ 23.) Loop Road begins and ends at intersections with the Tamiami trail. (*See id.*) The first 9 miles of Loop road are paved, while the remainder is covered in gravel. Tribe members use Loop Road for hunting, fishing, commercial air-boating, and subsistence farming. (*See id.* ¶ 8.) Over fifty Tribe families live on or near Loop Road. (*See id.* ¶ 26.)

In response to the 2005 Hurricane season, which included Hurricanes Katrina, Rita, and Wilma, Congress passed several emergency supplemental appropriations bills. (*See id.* ¶ 28.) In one of these bills, Congress authorized the Department of the Interior to allocate federal funds to government agencies, including Defendant National Park Service ("NPS"). The entire text of the relevant provision reads:

> For an additional amount for "Construction" for response, cleanup, recovery, repair and reconstruction expenses related to hurricanes in the Gulf of Mexico in calendar year 2005, $19,000,000, to remain available until expended: *Provided*, that the amount provided under this heading is designated as an emergency requirement pursuant to section 402 of H. Con. Res. 95 (109th Congress), the concurrent resolution on the budget for fiscal year 2006.

Pub. L. No. 109-148, 119 Stat. 2680 (Dec. 30, 2005), Division B, Title I, Chapter 5 (emphasis in original). After receiving emergency funds, NPS initiated a project styled "Repair Loop Road Damage Caused by Hurricane Wilma" (the "Project"). (*See* Amended Complaint ¶ 30.) The Project proposes several hurricane-related repairs to Loop Road, including raising the road level and paving portions of the road. (*See id.* ¶¶ 30, 31.)

---

[2] According to the Tribe, Congress recognized its rights to use and occupy the Big Cypress National Preserve. *See* Pub. L. No. 93-440.

On December 22, 2008, the Tribe filed suit against NPS to enjoin the Loop Road Project on the grounds that: (1) Hurricane Wilma did not inflict permanent damage to Loop Road; and (2) the Project will interfere with the Tribe's members' access to and use of Loop Road, their homes, and surrounding areas. (*See* Response at 5.) On April 27, 2009, the parties held a settlement conference at which the parties were unable to resolve this matter. (*See* DE 35 at 1.) On May 11, 2009, the Tribe filed its Amended Complaint, which asserts three Counts against the Government.

In Count I of the Amended Complaint, the Tribe alleges that, because Loop Road was not damaged by Hurricane Wilma, the Project exceeds the Government's authority, which, under Public Law 109-148, is limited to reconstruction of damaged areas. (*See* Amended Complaint ¶¶ 50-53.) The Tribe further avers that the "emergency supplemental appropriations constitute relevant statutes which may form the basis of an APA claim." (*See id.* ¶ 54.) In Count II, the Tribe asserts that the Government's failure to comply with the appropriations statute violates 31 U.S.C. §1301(a), which provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." (*See id.* ¶¶ 57-59.) The Government's violation of section 1301, the Tribe maintains, forms the basis of its APA claim. (*See id.* ¶ 62.) Finally, in Count III, the Tribe states that the Government failed to conduct an environmental impact study or environmental assessment prior to commencing the Project in violation of the National Environmental Policy Act ("NEPA"). (*See id.* ¶¶ 41-42, 46, 67-68, 70-71.) Without the appropriate environmental studies, the Tribe alleges that the Government has not ensured that it has taken all steps to ensure environmental safety and is therefore in violation of the APA. (*See id.*)

The Government moved to dismiss Counts I and II, arguing that, unlike its NEPA action in Count III, the Tribe has no vindicable interest in Public Law 109-148 or section 1301 and therefore lacks standing to enforce their requirements. (*See* DE 18 "Motion" 4-8, 12-13.) The Tribe responded that: (1) its members will be harmed by the NPS Project; and (2) appropriations statutes can form the basis of its action under the Administrative Procedures Act. (*See* DE 25 "Response" at 7, 11.) Further, the Tribe argued that, at the very least, they should be permitted to conduct discovery to determine the extent of its harm. (*See id.* at 2, 13.) In reply, the Government argued that no discovery was necessary because, on the face of the Amended Complaint, the Tribe could not establish a legally

protected interest in the appropriations statutes. (*See* DE 27 at 2.)

On September 14, 2009, the Tribe's counsel filed an affidavit in which he recounted statements made by Government officials at the parties' April 27, 2009 settlement conference. (*See* DE 33, Ex. 1 "Dasher Decl.") In relevant part, Government officials stated that the Project may have an impact on the environment but they had not yet conducted an environmental study. (*See id.* ¶ 4.) On September 17, 2009, the Government moved to strike the affidavit on the grounds that it was offered to prove liability, in violation of Fed. R. Evid. 408. In response, the Tribe contended that it offered the affidavit to prove that the Government acted in bad faith, not liability.

## II.     Standards

The Tribe bears the burden of proving that this Court has subject matter jurisdiction to proceed under Counts I and II. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (Lujan II). To obtain Article III standing, the Tribe must: (a) have suffered an "injury in fact" - an invasion of a legally protected interest which is (i) concrete and particularized, and (ii) actual or imminent, not conjectural or hypothetical; (b) have an injury causally connected to the conduct complained of; and (c) have an injury which is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61 (citations omitted). In addition to satisfying the Article III test, the Tribe must meet broader "prudential standing" requirements, which demand that "the injury [the Tribe] complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 883 (1990) (Lujan I). "The essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law." *Clarke v. Security Industry Association*, 479 U.S. 388, 399 (1987).

At the motion to dismiss stage, the Tribe "is only required to generally allege a redressable injury caused by" agency action. *Miccosukee Tribe of Indians of Florida v. Southern Everglades Restoration Alliance*, 304 F.3d 1076, 1081 (11th Cir. 2002). To maintain an action under the APA, the Tribe must assert that it was "aggrieved by agency action *within the meaning of a relevant statute*." 5 U.S.C. § 702 (emphasis supplied). "There is no right to sue for a violation of the APA in the absence of a relevant statute whose violation forms the legal basis for [the] complaint." *Sierra Club v. Martin*, 110 F.3d 1551, 1554-55 (11th Cir. 1997) (citations omitted).

### III. Discussion

#### A. The Tribe's Standing Burden

The Tribe and the Government disagree on what the Tribe must demonstrate to bear its burden of proving standing. At the September 18, 2009 hearing, the Tribe argued that its burden consisted of showing: (1) an injury that (2) fell within the zone of interests to be protected by the appropriations statutes despite the statutes' silence on benefits to the Tribe. Citing to *Clarke*, 479 U.S. at 399, the Tribe emphasized that the zone of interests test was not particularly onerous and that its interests were not "so marginally related to" the appropriations statutes such that it fell outside the zone of interests.

By contrast, the Government maintained that, in addition to the zone of interests test, Article III requires the Tribe to show a "legally protected interest" under the statute that the Government violated. The Government contended that the Tribe has no interest in the aforementioned appropriations statutes which is cognizeable and enforceable in an Article III court. The Government's formulation is the appropriate test for the Court's inquiry.

To meet the Article III injury in fact requirement, this Circuit requires plaintiffs to demonstrate that a defendant "has invaded some *legally protected interest*." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980-81 (11th Cir. 2005) (holding that the plaintiff had no legally protected interest in contract to which he was not a party) (citations omitted) (emphasis supplied). Indeed, "[n]o legally cognizable injury arises unless an interest is protected by statute or otherwise." *Id.* Because Article III requires the Tribe to assert a legally protected interest under the statute, and the appropriations statutes cited as the basis for the Tribe's harm do not protect its members' interests, the Tribe fails to demonstrate Article III standing.

#### B. The Tribe's Interest in the Appropriations Statutes

To begin, the Amended Complaint indicates that the Tribe's interests in the Loop Road area include: (1) occupational and residential purposes; (2) "numerous cultural, religious, recreational and other purposes;" and (3) subsistence and recreational activities, such as "hunting, fishing, frogging, commercial air-boating, [and] subsistence agriculture." (*See* Amended Complaint ¶¶ 6-9, 11.) The Project threatens these interests because Loop Road reconstruction efforts will promote "dust, noise, emissions, traffic, garbage, [and] human impact." (*See id.*

¶ 3.) In essence, then, the Tribe complains that the Project will become a nuisance and invade its members' interests in quiet enjoyment of the Loop Road area. Taking these allegations as true, the Tribe fails to show how Pub. L. 109-148 and section 1301 protect those interests. As best as the Court can discern, Pub. L. 109-148 protects the NPS's interest in $19,000,000.00 for construction and recovery efforts. Further, section 1301 protects Congress's interest in having appropriations applied to the purposes it dictates. Neither statute, however, intimates any protection for the Tribe's interests in quiet enjoyment and against nuisance.

The Tribe asks the Court to construe the appropriations statutes broadly,[3] but the Article III injury in fact requirement demands that the Tribe's interests be discernible from the relevant statute. For example, in *Animal Legal Defense Fund, Inc. v. Glickman*, 154 F.3d 426, 428, 434 (D.C. Cir. 1998), the court addressed the scope of the plaintiff's members' legally protected aesthetic interests in observing animals living under humane conditions under the Animal Welfare Act ("AWA"), which required the United States Department of Agriculture to promulgate physical environment standards to ensure "the psychological well-being of [non-human] primates." The court rejected the argument that the protected aesthetic interests were so broad as to include the interests of persons offended at the sight of humanely treated animals:

> [I]f the hypothetical sadist challenged the regulations at issue here (presumably, for being too protective of animal welfare), he would not be able to establish injury in fact because the AWA, the relevant statute, recognizes no interest in sadism. To the contrary, it requires dealers, exhibitors, and research facilities to treat animals humanely.

*Id.* n.7.

Similarly, the appropriations statutes underlying Counts I and II protect no interests in quiet enjoyment or against nuisance.

The Tribe attempts to draw comparisons to its interests as stated in *Southern Everglades*, 304 F.3d at 1080, in which it claimed that the delays caused by the agency advisory committee process "damaged tribal lands" and

---

[3] As an alternative argument, the Tribe suggests that it may graft its interests from other statutes, such as those statutes recognizing its use and occupancy rights, onto the appropriations statutes in Counts I and II. Not only does the Amended Complaint not conform to this theory, see Amended Complaint ¶¶ 54, 62, but the Tribe cites no case law in support. Moreover, as a practical matter, federal courts would be inundated with lawsuits if Article III recognized standing for parties to sue on appropriations statutes in which they have no particularized, legally protected interest merely because unrelated laws implicated their interests.

"will in turn continue to damage the land that the Tribe relies on for its subsistence." However, as the Eleventh Circuit recognized, the legally protected interest asserted in *Southern Everglades* arose from the Federal Advisory Committee Act ("FACA"), which undisputedly recognizes citizens' interests in public disclosure of the advisory roles played in agency decision-making.[4] *See id.* at 1106. Indeed, the *Southern Everglades* court cited *Alabama-Tombigbee Rivers Coalition v. Dept. of Interior*, 26 F.3d 1103, 1106 (11th Cir. 1994), which explained FACA's public-oriented purpose: "[t]hrough the passage of FACA, Congress sought to recognize the importance of having advisory committees to the Executive Branch be completely open to public observation and comment."

Conversely, the appropriations statutes which form the basis of Counts I and II express no similar public purpose, nor do they express a purpose to protect the Tribe's quiet enjoyment interests.[5] Further, to the extent the appropriations statutes express the Tribe's interest in the proper allocation of NPS's construction funds, that interest is undifferentiated from the interests of taxpayers generally.[6] To be clear, the Court does not liken the

---

[4] *See Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440, 450 (1989) ("refusal to permit appellants to scrutinize the [advisory committee's] activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue").

[5] Other cases in which the Tribe sought relief before this Court involved statutes which express interests more specific to the Tribe than are asserted in Counts I and II. In *Miccosukee Tribe of Indians of Fla. v. United States*, 574 F.Supp.2d 1360, 1367 (S.D. Fla. 2008), where this Court held the Tribe failed to allege facts showing that the Tribe's interests was violated by agency action, the statute at issue put strict conditions on the Department of Transportation's use of public parks:

> [T]he Secretary of the DOT may approve a transportation program or project ... requiring the use of publicly owned land of a public park, recreation area, or wildlife or waterfowl refuge of national, State, or local significance ... only if (1) there is no prudent or feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site from the use.
> *Id.* at 1363.

By contrast, the appropriations statutes at issue here place no similar restrictions on NPS's actions. *Cf. Miccosukee Tribe of Indians of Florida v. United States*, 6 F.Supp.2d 1346, 1348 (S.D. Fla. 1998) (holding that Tribe had standing to sue under NEPA); *Miccosukee Tribe of Indians of Florida v. United States*, 430 F.Supp.2d 1328, 1331 (holding that Tribe had standing to sue under NEPA and ESA).

[6] In this vein, the Tribe's complaints about how NPS spends the emergency relief funds raise the comparison to taxpayer standing because the only *type* of interests the appropriations bills at issue here can be read to protect are interests in the proper allocation of funds. The Tribe's interest in the proper allocation of funds are, unfortunately, indistinguishable from those of other taxpayers. *Cf. Public Citizen, Inc. v. Simon*, 539 F.2d 211, 218 (D.C. Cir. 1976). Article III courts, to be sure, lack the institutional competence to determine the proper objects for federal expenditures. The *Public Citizen* court noted that, to recognize standing to "attack any executive action that draws on an outstanding appropriation on the ground that the purchases or services are not in accord with the congressional intent in passing the appropriation . . . would place the judiciary in the role of management overseer of the Executive Branch. Such oversight is a function of Congress." *Id.*

Tribe's members' interests in their habitat to the ephemeral considerations of the average taxpayer. Rather, the Court cannot glean the legal protection for the Tribe's members' interests in their habitat from the appropriations statutes because those statutes do not appear to protect against nuisance.

Finally, the Tribe argues that appropriations statutes can form the basis of a legally protected interest, citing to *National Leased Housing Ass'n v. U.S. Dept. of Housing and Urban Development*, 2007 WL 148829 (D.D.C. January 16, 2007). The Tribe's argument here is a non-starter. In addition to the fact that the *National Leased Housing* court did not discuss standing, the appropriations statute at issue in that case accords particularized legal interests in public housing authorities.

The appropriations provisions at issue in *National Leased Housing* altered the administrative fee system which was used to compensate public housing authorities for administering the federal section 8 housing voucher program. *Id.* at *5. "The Act also made two changes to the method of calculating administrative fees for fiscal year 2003." *Id.* Several public housing authorities and their umbrella organizations brought suit to "challenge HUD's interpretation of the Fiscal Year 2003 Appropriations Act, specifically, the Agency's interpretation of the Reduction and Recapture Provisions," which specifically named the public housing authorities.[7] *Id.* at *10. By contrast, the appropriations statutes at issue in this case make no mention of the Tribe nor do they give any indication that they contemplate the Tribe's interests. Because the Tribe fails to meet its burden to show Article III standing, the Court need not reach the question of the Tribe's prudential standing. The Court will dismiss Counts I and II.

---

[7] The appropriations statute specifically provided:

> That, notwithstanding any other provision of law or regulation, the amount of fiscal year 2003 fee payments otherwise authorized ... for a public housing agency shall be reduced accordingly by any such amounts remaining in such agency's administrative fee reserve account as of January 31, 2003 which exceed 105 percent of the amount of fees paid to such agency from funds made available in fiscal year 2002.

*National Leased Housing*, 2007 WL 148829 at *5.

The statute also required the Secretary of HUD to:

> [R]ecapture any funds provided [for administrative fees] from a public housing agency which are in excess of the amounts expended by such agency for the section 8 tenant-based rental assistance program and not otherwise needed to maintain an administrative fee reserve account balance of not to exceed 5 percent.
> *Id.*

### C. Motion to Strike and the Tribe's Entitlement to Discovery

The Government argues that the Tribe's affidavit should be stricken because: (1) it offers statements made at the parties' settlement conference to prove liability; and (2) the statements are irrelevant to the motion to dismiss. (*See* DE 35 at 1-6.) The Tribe maintains, however, that it offers the statements to demonstrate that the Government is acting in bad faith. (*See* DE 37 at 2.) Further, the Tribe argues that it produced the affidavit to demonstrate its entitlement to discovery. (*See id.*)

To be sure, Fed. R. Evid. 408 prohibits the use of statements made in settlement conferences for purposes of proving liability. However, the rule allows their use for other purposes, such as proving bad faith. *See* Fed. R. Evid. 408 Advisory Committee's Note (2006); *see also Athey v. Farmers Ins. Exchange*, 234 F.3d 357, 362 (8th Cir. 2000). Therefore, the Court will deny the motion to strike. Nonetheless, the Tribe fails to make the showing required to warrant discovery beyond the administrative record in its remaining NEPA action under the APA.

The showing of bad faith required to establish an entitlement to discovery in an administrative review proceeding must be a "strong" one. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army*, 87 F.3d 1242, 1246-47 (11th Cir. 1996). In regards to Count III, the Tribe's affidavit only states that Government officials represented that they did not conduct an environmental assessment and that the Project may have an impact on the environment. (*See* Asher Decl. ¶ 4.) These assertions, without more, do not support a finding that the Government acted in bad faith when it allegedly failed to produce an environmental study.

Furthermore, the Tribe's request for discovery is premature. Generally in NEPA actions, discovery beyond the administrative record is permitted only "if an inadequate evidentiary development before the agency can be shown." *See Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (5th Cir. 1973) *overruled on other grounds by Envtl. Def. Fund, Inc. v. U.S. Army Corps of Engineers*, 492 F.2d 1123, 1139 (5th Cir. 1974). The Tribe has not shown that the agency inadequately developed an evidentiary predicate for its alleged failure to produce an environmental study. Indeed, the administrative record has not yet been produced.

Accordingly, the Court will require the Government to file its answer no later than October 9, 2009 and the administrative record no later than October 30, 2009. Thereafter, the parties must file motions to supplement the record no later than November 13, 2009. No later than October 30, 2009, the parties shall provide the Court

with a proposed briefing schedule for their motions for summary judgment.

V.      **Conclusion**

For the reasons discussed above, the Court will grant the Government's motion to dismiss Counts I and II. Further, the Court will deny the Government's motion to strike. The Court will also require the Government to file its answer no later than October 9, 2009 and the administrative record no later than October 30, 2009. The Tribe may file motions to supplement the administrative record no later than November 13, 2009. Further, no later than October 30, 2009, the parties must provide the Court with a proposed briefing schedule for their motions for summary judgment. Accordingly, it is hereby

ORDERED that

(1) The Government's Motion to Dismiss Counts I and II [DE 18] is GRANTED. Counts I and II are DISMISSED.

(2) The Government's Motion to Strike [DE 35] is DENIED.

(3) No later than **October 9, 2009**, the Government must file its answer to the Amended Complaint

(4) No later than **October 30, 2009**, the Government must file the administrative record.

(5) No later than **October 30, 2009**, the parties must file a proposed briefing schedule for motions for summary judgment.

(6) No later than **November 13, 2009**, motions to supplement the administrative record must be filed.

DONE and ORDERED in Miami, Florida, this 29th day of September, 2009.

_____
PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:
Counsel of Record